UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

| | |
|---|---|
| RAHIM SALAAM, #259238, ) | |
| ) | |
| Plaintiff, ) | Case No. 5:05-cv-97 |
| ) | |
| v. ) | Honorable Paul L. Maloney |
| ) | |
| KENNETH McKEE, ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Defendant. ) | |
| _____) | |

      This is a civil action brought *pro se* by a state prisoner pursuant to 42 U.S.C. § 1983. Plaintiff is an inmate at the Florence Crane Correctional Facility located in Coldwater, Michigan. Plaintiff's complaint relates to a period from late 2004 through mid-2006 when plaintiff was a Level II prisoner at the Bellamy Creek Correctional Facility ("IBC"), located in Ionia, Michigan. The defendant Kenneth McKee was IBC's warden during that time period.[1] Plaintiff alleges that defendant's scheduling of American Muslim prayer services for IBC's Level II prisoners during the 11:30 a.m. to 12:30 p.m. time slot rather than the 1:00 p.m. to 2:00 p.m. time slot the warden had allotted to IBC's Level IV prisoners violated plaintiff's rights under the First Amendment's Free Exercise Clause. (Am. Compl., ¶ V, docket # 7).[2] Plaintiff's complaint, as amended, seeks an

---

    [1]Defendant McKee is currently the warden at the Pine River Correctional Facility.

    [2]On September 7, 2006, the court dismissed plaintiff's claims for injunctive relief. (Order, docket # 76). The court granted in part and denied in part plaintiff's motions for leave to amend his complaint. Paragraph VI of the complaint was deemed amended *instanter* to include a claim for monetary damages against defendant in his individual capacity based on defendant's alleged violation of plaintiff's rights under the First Amendment's Free Exercise Clause. Plaintiff's motion

award of monetary damages against defendant in his individual capacity. The matter is now before the court on defendant's motion for summary judgment. (docket # 77). On October 26, 2006, plaintiff filed his brief in response to defendant's motion (docket # 81), and defendant's motion has long been ready for decision. Upon review, I recommend that defendant's motion for summary judgment be granted, and that judgment be entered in defendant's favor.

## **Applicable Standards**

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006); *Briggs v. Potter*, 463 F.3d 507, 511 (6th Cir. 2006). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Swiecicki v. Delgado*, 463 F.3d 489, 492 (6th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the party without the burden of proof (generally the defendant) seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or

---

to amend and supplemental motion to amend were denied in all other respects. (*Id.*).

-2-

other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252); *see Kessler v. Visteon Corp.*, 448 F.3d 326, 329 (6th Cir. 2006). "A nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part on credibility considerations. Instead, the nonmoving party must present evidence to defeat a properly supported motion for summary judgment. The party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or to refute the proof of the moving party in some material portion, and the opposing party may not merely recite the incantation, 'credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Fogerty v. MGM Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004), *cert. denied*, 543 U.S. 1120 (2005).

**Facts**

The following facts are beyond genuine issue. Plaintiff was an inmate at the Bellamy Creek Correctional Facility ("IBC") from late 2004 until his transfer to another Michigan prison in mid-2006.[3]  Defendant McKee was IBC's warden.

When IBC opened in 2001, and for approximately two years thereafter, it was exclusively a Level IV prison facility. In February of 2003, IBC was designated as a multi-level facility. Michigan generally prohibits contact between prisoners of different security levels and the State relies on the wardens of its multiple security level prisons to develop and implement procedures consistent with that administrative goal. (Policy Directive PD 05.03.140, ¶¶ KK, LL, docket # 19, Ex. 2). At all times relevant to plaintiff's complaint, IBC housed inmates at five different security levels:  Levels I, II, IV, protective segregation, and administrative segregation. (McKee Aff. ¶¶ 2, 3, 5, docket # 19, Ex. 1). "The success of running multi-level prison facilities, from a custody and security standpoint, is based on keeping prisoners in different custody levels separate from one another as much as administratively possible. Level IV prisoners require more staff involvement, as they tend to be more disruptive, more disobedient, they receive more misconducts, and pose more of a threat to the safety of staff and other prisoners." (*Id.* ¶ 8). Special precautions are taken in light of the dangers posed by Level IV prisoners. For example, only one housing unit of Level IV prisoners is allowed to move at a time. The Level IV prisoners generally have attained that strict security level through their past inappropriate prison behavior. (*Id.* ¶ 4).

IBC prohibited the mixing of prisoners of different security levels during any activity. The only "variance" permitted by the State of Michigan occurred under close supervision inside the

---

[3]The parties did not submit evidence regarding the exact dates of plaintiff's IBC confinement.

prison's "chow hall." Level II prisoners were permitted to serve food to Level IV prisoners. The Level IV prisoners could not be assigned to kitchen jobs for obvious safety and security reasons. (McKee Aff. ¶ 7).

IBC's physical resources and staff were limited. All IBC prisoner programs were conducted inside the prison's Programs Building. The programs IBC offered its prisoners included school, recreation (gym), library, group counseling, the barber shop, and religious services. Maintaining the physical separation of prisoners at different security levels required a very structured schedule. IBC's Level II population had access to the Programs Building during the 5-hour period from 7:30 a.m. to 12:30 p.m. each day. Level IV prisoners had access to the Programs Building only during a shorter three-hour period from 12:30 p.m. to 3:30 p.m. Separate religious services were scheduled for prisoners of different custody levels. In-room staff supervision was required at all times for Level IV prisoner activities and religious services. (McKee Aff. ¶¶ 9, 12; Policy Directive PD 05.03.150, ¶ AA, docket # 19, Ex. 3). Religious services at each custody level were scheduled for the time period the majority of prisoners at that security level had leisure time, taking into account available staffing resources. (McKee Aff. ¶ 11; Policy Directive PD 05.03.150, ¶ CC).

The only evidence plaintiff offered in opposition to defendant's motion for summary judgment consists of defendant's response to plaintiff's May 6, 2005 grievance (docket # 29, Ex A) and defendant's responses to three requests for admission.[4] On May 16, 2005, plaintiff filed a

---

[4]On October 10, 2006, the court advised plaintiff of his opportunity to file affidavits, documents and other materials in opposition to defendant's motion for summary judgment. (Order, docket # 80). Plaintiff filed a brief, but did not file any affidavits or other evidence in opposition to defendant's motion. Plaintiff's brief contained an express reference to the warden's response to his May 16, 2005 grievance (docket # 29, Ex. A) and it quoted defendant's responses to plaintiff's requests for admissions. (Plf. Brief at 4, 7, 8 docket # 81).

grievance alleging that a violation of Policy Directive PD 05.01.40 had occurred on May 6, 2005. Plaintiff claimed that on that date, while he had been attending the Level II Sunni Muslim call out from 11:30 a.m. to 12:30 p.m. inside the Programs Building, a "Level IV call out for recreation in connection to the gym [in] which Level II Sunni Muslims gather for their call out" occurred. Plaintiff alleged that contact with Level IV prisoners occurred in the gym and in a rest room. Plaintiff claimed that this proximity to Level IV inmates placed him in an unsafe environment, posed a threat to his security, and he asked that prison officials prevent contact between Level II and Level IV inmates. (*Id.*). The Step I grievance response advised that "no [Level IV] recreation callouts [were] scheduled in the building" during the 11:30 a.m. to 12:30 p.m. time frame. It emphasized that every effort was being made to keep the Level II and Level IV inmates separated, particularly during the transition period from Level II use to Level IV use of the Programs Building. The Step I grievance response stated that bathroom use was closely monitored to prevent contact between Level II and Level IV prisoners. Plaintiff was advised that Level II prisoners could assist prison officials by using the restroom facilities in the housing unit before attending services, thus reducing the potential for contact with Level IV prisoners in the Programs Building's bathroom. (*Id.*). Plaintiff pursued an appeal to Step 2. On June 13, 2005, plaintiff's grievance was denied at Step 2 for the reasons stated at Step 1. (*Id.*). Plaintiff presented no evidence that he pursued a Step III appeal.

Plaintiff's three requests for admissions and defendant's responses are set forth below:

> Question # 3:  Admit or [d]eny that the administration at IBC had scheduled religious programs for Level II prisoners to avoid mixing levels according to Policy Directive 05.01.140[.]

> Response: Admit, I Warden McKee have reviewed the program schedule. Level II prisoners currently have Jumah Services in the gym on Fridays between 11:35 a.m. 12:35 p.m. Level IV prisoners have their Jumah services later. In addition, IBC conducts Level IV school and law library sessions. Programs for Level II and Level IV prisoners are scheduled and closely monitored by security and support staff to ensure that the two levels do not intermingle or mix.
>
> Question #4: Admit or [d]eny you are aware that Sunni Muslims must conduct Jumah Services according to the Islamic practice which, is between the hours of 1:00 p.m. and 3:00 p.m., when the sun reaches its zenith[.]
>
> Response: Admit, to the extent that I, Warden McKee, understand from the CFA religious coordinator, that Zuhr prayer can be made at any time after the sun passes its highest point and that therefore, our scheduling of Level II prisoners from 11:35 a.m. to 12:35 p.m. falls within the prescribed time period for holding Jumah Services.
>
> Question # 5: Admit or [d]eny that IBC Administration[] has not and currently is not allowing Level II prisoners to attend the Sunni Muslim services at the prescribed time between 1:00 p.m. and 3:00 p.m. on Fridays[.]
>
> Response: Admit, but see Responses # 3 and # 4. It is my understanding that Level II Jumah services are currently being held within a permissible time frame under the Sunni religious standards.

(Plf. Brief at 4, 7 docket # 81).

## Discussion

Plaintiff alleges that defendant's schedule violated his First Amendment rights and seeks an award of monetary damages against defendant in his individual capacity. The gravamen of his complaint is that he and other Level II Muslim prisoners should have been allowed to attend prayer services between 1:00 p.m. and 2:00 p.m. Defendant's motion for summary judgment seeks entry of judgment in defendant's favor on qualified immunity and other grounds. "The purpose of the qualified immunity defense is to protect public officials from undue interference with their duties and from potentially disabling threats of liability." *Perez v. Oakland County*, 466 F. 3d 416, 426 (6th

Cir. 2006); *see Vakilan v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003). When a defendant raises the defense of qualified immunity, the plaintiff bears the burden of demonstrating that the plaintiff is not entitled to qualified immunity. *See Haynes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007); *Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006); *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818; *see Hudson v. Hudson*, 475 F.3d 741, 744 (6th Cir. 2007). The question whether qualified immunity attaches to an official's actions is a purely legal issue for the trial court. *See Fox v. DeSoto*, 489 F.3d 227, 235 (6th Cir. 2007); *Swiecicki v. Delgado*, 463 F.3d 489, 497 (6th Cir. 2006); *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

The Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), emphasized that the defense of qualified immunity must be addressed in proper sequence. The initial inquiry must be whether the plaintiff has alleged and supported with evidence[5] facts showing that

---

[5] A qualified immunity defense can be asserted at various stages of the litigation, including the summary judgment stage. *See English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994). The qualified immunity inquiry at the summary judgment stage is distinguished from the Rule 12(b)(6) stage in that generalized notice pleading no longer suffices, and the broader summary judgment record provides the framework within which the actions of each individual defendant must be evaluated. *See Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 62 (1st Cir. 2004). At the summary judgment stage, a plaintiff may not rely on his pleadings. Rather, the issue is whether "the plaintiff has offered sufficient evidence to indicate that what the official did was objectively unreasonable in light of the clearly established constitutional rights." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004).

the defendants' conduct violated a constitutional right. *Saucier*, 533 U.S. at 201; *see Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007); *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006); *see also Armstrong v. City of Melvindale*, 432 F.3d 695, 699 (6th Cir. 2006) ("Whether a constitutional violation occurred is a threshold issue: if the officers' conduct violated no constitutionally protected right, there is no need for further analysis."); *accord Caudill v. Hollan*, 431 F.3d 900, 908 n.5 (6th Cir. 2005) ("[D]istrict courts . . . may not assume a constitutional violation or skip to qualified immunity, even when qualified immunity analysis seems conclusive.").

### A. Defendant's Scheduling Order Did Not Violate Plaintiff's First Amendment Rights.

A prisoner retains only those First Amendment freedoms which are "not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Martin v. Kelley*, 803 F.2d 236, 240 n.7 (6th Cir. 1986). Lawful incarceration legitimately requires the retraction or withdrawal of many rights and privileges as a necessary consequence of society's need to deter and punish crime. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).[6] "The limitations on the exercise of constitutional

---

[6] Free Exercise Clause claims generally present two threshold issues: (1) whether the plaintiff's beliefs are religious in nature; and (2) whether those religious beliefs are sincerely held. *United States v. Seeger*, 380 U.S. 163, 183-84 (1965). Only beliefs that are religious in nature are protected by the Free Exercise Clause. *See Thomas v. Review Bd. of the Indian Employment Sec. Div.*, 450 U.S. 707, 713-14 (1981); *Sherbert v. Verner*, 347 U.S. 398 (1963); *see also DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) ("The mere assertion of a religious belief [by a prisoner] does not automatically trigger First Amendment protections . . . only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection."). Without doubt, prison officials are entitled to assure themselves of a prisoner's sincerity of religious belief as a prerequisite to their considering a request for an accommodation. *See Africa v. Pennsylvania*, 662 F.2d 1025, 1030 (3d Cir. 1981). In the absence of such an inquiry, prisoners would be free to assert false religious claims that are actually attempts to gain special privileges or disrupt prison life. *See Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996); *accord Baranowski v. Hart*, 486 F.3d 112, 118-

rights arise both from the fact of incarceration and from valid penological objectives -- including deterrence of crime, rehabilitation of prisoners, and institutional security." *Pell v. Procunier*, 417 U.S. at 822-23. "The Supreme Court has held that in most circumstances, prison officials 'should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

In *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), the Supreme Court held that the constitutionality of prison regulations that infringe upon a prisoner's rights under the Free Exercise Clause of the First Amendment must be evaluated under the deferential standard set forth in *Turner v. Safley*, 482 U.S. 78 (1987). The now familiar *Turner* factors are: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to the inmate; (3) what impact that accommodation of the asserted constitutional right would have on guards, other inmates, and prison resources generally; and (4) whether there are other readily available alternatives at a *de minimis* cost to valid penological interests.[7]  482 U.S. at 89-91.

> [S]uch a standard is necessary 'if prison administrators . . ., and not the courts [are] to make the difficult judgments concerning institutional operations.' *Jones v. North Carolina Prisoner's Union*, 433 U.S. [119,] 128 [(1977)]. Subjecting day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and adopt innovative solutions to the intractable problems of

---

22 (5th Cir. 2007).  Defendant's motion for summary judgment is not based on arguments that plaintiff's beliefs are not religious in nature or that plaintiff's beliefs are not sincerely held.

[7]This court is not required to "weigh evenly, or even consider explicitly, each of the four *Turner* factors." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999).

>prison administration. The rule would also distort the decision making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby 'unnecessarily perpetuat[ing] the involvement of the federal courts in the affairs of prison administration.' *Procunier v. Martinez*, 416 U.S. [396], 407 [(1974)].

*Turner*, 482 U.S. at 89. In *O'Lone*, the Supreme Court upheld as constitutional a prison policy which prevented inmates assigned to a "gang minimum" security classification from returning to the prison during the day which had the effect of preventing the prison's Muslim inmates from attending "Jumu'ah" services. 482 U.S. at 345-53. The Supreme Court concluded its *O'Lone* decision with the following statement: "We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to substitute our judgment on difficult and sensitive matters of institutional administration for the determinations of those charged with the formidable task of running a prison." 482 U.S. at 353.

The record clearly demonstrates that the warden's decision to schedule Level II prisoners for the 11:30 a.m. to 12:30 p.m. time slot was motivated solely by security concerns, namely, the desire to keep Level II prisoners away from more dangerous Level IV inmates. There is a valid, rational connection between the warden's schedule and the legitimate governmental interest put forward to justify it. The legitimate governmental interest is prison security. Prison security is not only a legitimate governmental interest, it is recognized by the courts as a *compelling* governmental interest. *See Hoevenaar v. Lazaroff*, 422 F.3d 366, 368 (6th Cir. 2005); *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004) ("Institutional security is the most compelling governmental interest in a prison setting, and security is particularly important in dealing with group activities because of the potential for riots and the extensive damage resulting from

them."); *Bech v. Campbell*, No. 96-5781, 1997 WL 420501, at * 1 (6th Cir. July 8, 1997); *see also Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006); *Brunskill v. Boyd*, 141 F. App'x 771, 774 (11th Cir. 2005); *Diaz v. Collins*, 114 F.3d 69, 73 (5th Cir. 1997); *Harris v. Chapman*, 97 F.3d 499, 503 (11th Cir. 1996) ("It is well established that states have a compelling interest in security and order within their prisons."). There is a valid, rational connection between the policy, preventing IBC's lower and higher security level inmates from occupying the Programs Building at the same time. *See McRoy v. Sheahan*, 205 F. App'x 462, 464 (7th Cir. 2006); *accord Freeman v. Texas Dep't of Criminal Justice*, 369 F.3d 854, 861 (5th Cir. 2004) ("Although some Church of Christ prisoners may not be able to attend a service perfectly suited to their faith, this limitation is dictated by the demands of administering religious services to tens of thousands of inmates representing widely divergent faiths."). Plaintiff has not disputed that he retained alternative means to practice his faith. *See O'Lone*, 482 U.S. at 352. Accommodation of plaintiff's asserted constitutional right would have had an adverse impact on guards, other prisoners and prison resources. *See Spies*, 173 F.3d at 405. It would have made an already dangerous prison environment even more dangerous. Finally, were no readily available alternatives at a *de minimis* cost to valid penological interests. The schedule implemented by defendant did not violate plaintiff's First Amendment rights.

**B.     Defendant's Scheduling Order Did Not Violate Clearly Established Law.**

Assuming *arguendo* that plaintiff had been able to satisfy the initial requirement under *Saucier*, plaintiff would nonetheless fall short of showing that the right he claims defendant violated was "clearly established" such that a reasonable official in the defendant's position, at the time the act was committed, would have understood that his behavior violated that right. 533 U.S.

at 201. The Supreme Court's decision in *Brosseau v. Haugen*, 543 U.S. 194 (2004), examined the underlying purpose of the requiring that the law be clearly established:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, misapprehends the law governing the circumstances she confronted. . . . Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

543 U.S. at 198. The Supreme Court and the Sixth Circuit have emphasized that the second inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. at 198 (quoting *Saucier*, 533 U.S. at 201); *see Silberstein*, 440 F.3d at 316. "'[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense.'" *Lyons v. City of Xenia*, 417 F.3d 565, 572 (6th Cir. 2005) (quoting *Brosseau*, 543 U.S. at 199); *see Perez*, 466 F.3d at 428 ("Because most legal rights are clearly established at some level of generality, immunity would be impossible to obtain if a plaintiff were required only to cite an abstract legal principle that an official had 'clearly violated.'"). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Rippy v. Hattaway*, 270 F.3d 416, 424 (6th Cir. 2001). "Thus, '[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quoting *Saucier*, 533 U.S. at 201); *see Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003); *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002). Although it is not always necessary to find a case where identical

conduct had previously been determined to be unconstitutional,[8] in light of pre-existing law, the unlawfulness must be apparent. *See Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003); *Risbridger*, 273 F.3d at 569. "Ordinarily, a Supreme Court or Sixth Circuit decision on point is necessary." *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *see Jackson v. Schultz*, 429 F.3d 586, 592 (6th Cir. 2005). The court must focus on whether, at the time the defendant acted, the right asserted was "clearly established" by the decisions of the Supreme Court or the Sixth Circuit. *See Reynolds v. City of Anchorage*, 379 F.3d 358, 366 (6th Cir. 2004); *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002). "'[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law.'" *Armstrong*, 432 F.3d at 699 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Thus, officials are 'entitled to qualified immunity [when] their decision was reasonable, even if mistaken.'" *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)); *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) ("Qualified immunity leaves government authorities 'ample room for mistaken judgments.'") (quoting *Scott v. Clay County*, 205 F.3d 867, 873 n. 9 (6th Cir. 2000)). "If reasonable officials could disagree on the issue, immunity should be recognized." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999); *see Akers*, 352 F.3d at 1042. "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow to raise a question about), the conclusion for every-like situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Saylor v. Board of Educ.*, 118 F.3d 507, 514 (6th Cir. 1997); *see Gragg*, 289 F.3d at 964. "The burden of

---

[8]"Of course, in an obvious case, [general constitutional] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau*, 543 U.S. at 199; *Lyons*, 417 F.3d at 572.

convincing a court that the law was clearly established 'rests squarely with the plaintiff.'" *Key*, 179 F.3d at 1000 (quoting *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997)); *see Perez*, 466 F.3d at 427.

Plaintiff made no attempt to carry his burden under the second prong of the qualified immunity analysis.[9] Plaintiff ignores his burden in favor of tossing insults at defense counsel: "Defense counsel has only established how ignorant she is on Islamic matters." (Plf. Brief at 3, docket # 81). The only references to "immunity" appearing in plaintiff's brief are on pages 5 and 6, referring to Eleventh Amendment immunity, not qualified immunity. Eleventh Amendment immunity does not apply to plaintiff's claim for monetary damages against defendant in his individual capacity. Plaintiff has not presented any legal authority establishing a clear First Amendment right to attend services later in the afternoon, at a time when the Programs Building was occupied by Level IV prisoners. Defendant attempted to balance the competing demands of IBC's prisoners of different security classifications. The schedule adopted by the warden was reasonable under *Turner*, and did not violate plaintiff's clearly established First Amendment rights. I find that defendant is entitled to judgment in his favor on the basis of qualified immunity.

---

[9]Plaintiff's complaint, as amended, did not allege a claim under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1(a)(1)(2). (*See* 9/7/2006 Memorandum Opinion at 3-5, docket # 75 and accompanying Order, docket # 76). The references in plaintiff's brief to RLUIPA and its "least restrictive means" test (docket # 81 at 6-7) are misplaced. However, even if plaintiff had alleged a claim under this statute, defendant would be entitled to judgment in his favor on the basis of qualified immunity.

**Recommended Disposition**

For the reasons set forth herein, I recommend that defendant's motion for summary judgment (docket # 77) be granted and that judgment be entered in favor of defendant.


Dated:  August 14, 2007             /s/  Joseph G. Scoville
                                    United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *McClanahan v. Commissioner*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).